# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18 CR 133 |
| ) | |
| JASON DORTCH and ) | Judge John J. Tharp, Jr. |
| DAVONTAE JONES, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

The defendants in this case have moved to suppress evidence of out-of-court identifications of the defendants made by victims of the carjacking that is charged in this case.[1] They have failed, however, to demonstrate that there is a substantial likelihood of misidentification. The motion to suppress is therefore denied.

## BACKGROUND

The following facts are based on statements from the victims, officers involved in the initial police response and in the apprehension and arrests of the defendants, a video from a neighbor's surveillance camera, and audio recordings of police radio transmissions responding to the crime. Neither defendant has proffered any testimony or other evidence disputing these facts.

Driving home on the evening of November 13, 2017, the two victims (A & B) arrived at about 10:30 p.m. on the 800 block of North Racine Avenue in Chicago in Victim A's white Jeep

---

[1] Defendant Dortch originally moved for an evidentiary hearing. ECF No. 29. At a status hearing on June 5, 2018, defendant Jones subsequently joined that motion. ECF No. 30. The Court denied the motion for an evidentiary hearing without prejudice because no motion to suppress had been filed. ECF No. 34. Defendant Dortch subsequently filed a motion to suppress. ECF No. 35. Defendant Jones did not expressly join that motion, but the Court will construe Jones prior oral request to join the original motion as extending to the subsequent motion filed by defendant Dortch.

Cherokee vehicle. They parked the car on the street and got out of the car. At that point, another white Jeep pulled alongside Victim A's car and two individuals quickly got out of that car, one (Offender 1) from the rear passenger seat on the non-driver's side, and the other (Offender 2) from the front passenger's seat. Another individual remained in the driver's seat of the offenders' vehicle.[2] Offender 1 grabbed Victim A (who had just exited from the driver's seat of his car) from behind, demanded his money and keys, and pushed Victim A toward the rear of Victim A's car. Offender 2 went around the front of Victim A's vehicle to the passenger side of the car and, after briefly accosting Victim B, approached Victim A pointing a handgun with an extended magazine and hit Victim A in the head with the gun. While that happened, Victim B was unattended and approached the two offenders as they were accosting Victim A (rather than backing away). After Victim A surrendered his keys and $40 cash, Offender 1 got into the driver's seat of Victim A's car. After backing Victim A onto the sidewalk, Offender 2 then turned his attention to Victim B and demanded money, but Victim B said he didn't have any. While this occurred, Victim A was looking directly at Offender 2 and even took several steps in his direction. After pausing for a moment, Offender 2 then went around the front of Victim A's car to the driver's side. Offender 1 got out of the car and ran to the Offender's vehicle, which he entered via the front passenger's door; Offender 2 got into the driver's seat of Victim A's car. Both cars then fled.

The video recording from a nearby surveillance camera reflects that the street was well lighted. The entire encounter from offenders' exit from their vehicle until time they drove off was approximately 34 seconds (22:30:02 – 36). At the scene, the victims described the two offenders as:

---

[2] So far as the record reflects, this third individual has not been identified.

- a black male, 23 – 25 years old; 6'0" tall, 170 pounds, with short black hair (the individual referred to above as Offender 1); and

- a black male, 23-25 years old; 5'7" tall, 170 pounds, with dreadlocks (the individual referred to above as Offender 2).

Less than half an hour after the incident, at about 11:00 p.m., a Chicago police officer spotted the victims' vehicle less than a mile away from the scene of the carjacking. The Jeep failed to pull over in response to the police car's signal and a chase ensued. Ultimately the Jeep crashed on west-bound I-290 in Oak Park. When the Jeep came to a stop, two individuals fled from the car. The individual who exited from the driver's seat of the Jeep headed south onto the east-bound side of I-290 and was apprehended on the expressway embankment. Police identified this individual as Davontae Jones. Jones is a black male and is 5'7" tall. At the time of his arrest, he was 18 years old, weighed approximately 150 pounds, and wore his hair in dreadlocks.

The second individual exited the Jeep from the front passenger side. Police observed him holding his side as he fled and letting go of something while in the median of the expressway; a search of that area located a handgun with an extended magazine. This individual was apprehended hiding in a backyard of a home near the south side of the expressway. Police identified him as Jason Dortch. Dortch is a black male and is 6'2" tall. At the time of his arrest, he was 19 years old, weighed approximately 170 pounds and had short black hair.

The victims were taken by police to the crash site, arriving at 11:43 p.m. Before being shown the individuals who had been apprehended, the victims were asked whether they believed that they would be able to recognize the individuals who carjacked their vehicle; both said yes. At the crash site, the defendants were not standing next to each other, but both were near the carjacked Jeep, handcuffed, and flanked by police. Each victim viewed the defendants from a distance of 20-

25 feet. Victim A positively identified defendant Jones as the individual who had pointed a gun at him and hit him in the head with the gun but was unable to identify defendant Dortch as one of the carjackers. Victim B positively identified both defendants as the two carjackers.

## DISCUSSION

The defendants seek an evidentiary hearing on their motion, but evidentiary hearings on motions to suppress are not granted as a matter of course. *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). The burden is on the defendant to show the need for an evidentiary hearing. *United States v. Aguilar*, 400 Fed. App'x 85, 88 (7th Cir. 2010); *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995). "Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion. Furthermore, a district court is obliged to hold a hearing only if the difference in facts is material, that is, only if the disputed fact makes a difference in the outcome." *Villegas,* 388 F.3d at 324 (cleaned up); *see also*, e.g., *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992).

Generally, to establish the existence of a material fact dispute, a defendant seeking to suppress evidence must proffer testimony, whether his own or from other witnesses, or other evidence that contradicts the government's account. *United States v. McGaughy,* 485 F.3d 965, 969 (7th Cir. 2007) (affirming denial of evidentiary hearing where defendant failed to identify any specific, material factual dispute requiring resolution through an evidentiary hearing); *United States v. Martin*, 422 F.3d 597, 603 (7th Cir. 2005) (same; "an evidentiary hearing is only required when the defendant specifically has alleged a definite disputed factual issue"). That there is a video recording of the carjacking makes the defendants' task to establish the existence of material fact

4

disputes all the more difficult. *Cf. Scott v. Harris,* 550 U.S. 372, 378-81 (2007) (where videotape of incident existed, non-movant's version of the incident should have been rejected in favor of the contradictory footage of the videotape).

Here, neither defendant has proffered, in any form, testimony (their own or from others) or other evidence that creates a fact dispute material to the outcome of the defendants' motion. Instead, they say the need a hearing so that they can cross-examine the victims about the circumstances of their encounter with the carjackers, which they characterize as "fact intensive issues." That they may be, but an evidentiary hearing is not warranted just because the reliability of an identification often presents a "fact intensive" issue; the purpose of an evidentiary hearing in the context of a suppression hearing is to resolve identified factual disputes that bear on the suppression issue.

The defendants have not identified any such fact dispute, however; they have offered nothing but conjecture that an examination of the victims might reveal information that suggests that their identifications were unreliable. Conjecture, however, does not warrant an evidentiary hearing; "the defendant must present definite, specific, detailed, and nonconjectural facts that justify relief." *United States v. Edgeworth*, 889 F.3d 350, 354 (7th Cir. 2018) (cleaned up) (evidentiary hearing not required when defendant offered only conclusory assertions that "lack[ed] any factual support or explanation"); *see also, e.g.*, *United States v. Holliman*, 558 Fed. App'x 679, 680-81 (7th Cir. 2014) (no evidentiary hearing required where defendant failed to contradict government's evidence that he abandoned handgun before yielding to officers' show of authority).

If a defendant's desire to question witnesses about the circumstances of an identification warranted an evidentiary hearing, a hearing would be required in every case involving an out-of-court identification. What defendant would not like the opportunity to depose witnesses to the

crime? But evidentiary hearings are not vehicles to permit defendants to conduct discovery of the testimony of potential witnesses against them. A defendant is not entitled to an evidentiary hearing to determine *if* there is a fact dispute; rather, a defendant must show that a material fact dispute exists to obtain an evidentiary hearing. *Martin*, 422 F.3d at 603 (rejecting argument that cross-examination of arresting officer would have enabled defendant "to identify facts necessary for the district court to rule on the suppression motion"). This requirement follows, of course, from placement of the burden of proof on the party seeking suppression of evidence. "The defendant bears the burden of both identifying a definite disputed factual issue, and demonstrating its materiality." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011).

In any event, the defendants' principal substantive argument is that the show up identification procedures employed by the police were unduly suggestive—and the government does not argue otherwise. The government does not defend by arguing that show up was not unduly suggestive and, accordingly, the Court will assume that it was. Any fact disputes that might bear on the suggestiveness of the show up process are irrelevant given the government's concession.

But just because an identification procedure is unduly suggestive does not mean that the identification should be suppressed. *Napoli*, 814 F.2d at 1155 (assuming without deciding issue of suggestiveness and resolving suppression issue based on determination that identifications at issue were sufficiently reliable). Unduly suggestive identification procedures do not, by themselves, violate due process. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Suppression is warranted only if there is a substantial risk that the identification made is the product of those unduly suggestive procedures. *Simmons v. United States*, 390 U.S. 377, 384 (1968) ("convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to

give rise to a very substantial likelihood of irreparable misidentification."). "Short of that point, such evidence is for the jury to weigh." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). That is because "reliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 114. "It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Biggers*, 409 U.S. at 198.

In view of the government's concession that the show up was unduly suggestive, here—as in *Biggers*—"the central question [is] whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Id*. at 199. And in *Biggers*, the Supreme Court held that the factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id*. at 199-200. Consideration of these factors, and others, convinces the Court that the identifications of the defendants by the victims in this case were sufficiently reliable, notwithstanding the suggestiveness of the show up process.

First, the video recording makes clear that both victims had a reasonable opportunity to view and interact with the offenders they identified. The victims engaged with their assailants for more than 30 seconds. Their observations were not glimpses during a fleeting encounter; each had a sustained opportunity to observe the defendants (though Victim 1's view of Offender 1 was significantly more limited than was that of Victim 2, given that he was approached by Offender 1

7

from behind). Further, the video makes clear that there was good lighting on the street where the assault occurred and that there was very little distance between the victims and the offenders during the encounter. The victims' observations were made from close-up. The defendants' assert that it is "faulty" to say that the victims got a good look at the offenders because this was "an extraordinarily unusual and traumatic event," ECF No. 32 at 5, and that they would therefore have been more likely to avert their gazes from the offenders. They also assert that the victims could not have gotten a good look at the offenders since the recording of OEMC dispatch transmissions reflect only that the offenders were "black males with guns." Both contentions are rebutted by what the surveillance camera video shows—namely, that both victims were looking directly at the offenders for significant portions of the encounter. Further, the Original Case Incident Report reflects that the descriptions provided at the scene of the carjacking by the offenders included characteristics, such as height, age, weight, and hair style, that were not included in the OEMC dispatch. And in any event, the defendants' speculation that the victims' may have been too frightened to look at the offenders does not, in the absence of some proffer of evidence to support such a finding, warrant a conclusion that the victims, in fact, did not get a good look at their assailants.

Second, and relatedly, the opportunity to view the offenders came during an armed robbery and carjacking; the defendants had every reason to be paying attention and to be focused on the event. They were not distracted; as the video shows, other than the carjacking, nothing else was happening on the street. The victims were frightened, we may assume, but that does not mean that they did not pay attention or were too intimidated to look squarely at the offenders. Victim A did not surrender his wallet until hit over the head with the gun, and Victim B refused to turn over his wallet, so it is reasonable to infer that the victims were not so cowed that they could not look at

the offenders. Indeed, rather than cowering from the offenders, at different times each of the victims walked *toward* the offenders. In light of these facts, the defendants' speculative premise that the victims were effectively blinded by fear is unconvincing and does not support an inference that the identifications were unreliable.

Third, the descriptions the victims gave to the police, as set forth in the Original Case Incident Report, were quite consistent with the characteristics of Dortch and Jones. The descriptions were close as to the height, age, weight, and hair style of the offenders, demonstrating that the victims did indeed get a good view of the offenders during the crime. Dortch's description of himself as "tall, baby faced, and extremely young" is not inconsistent with the victims' description of Offender 1 as being 6 feet tall and 23-25 years old, and Dortch simply ignores the other characteristics the victims added, which are spot on: Dortch, like the description of Offender 1, weighed 170 pounds and had short black hair. Even without the show up identifications, evidence that the offenders had been described by the victims as two black males, one 6 feet tall, the other 5'7", the taller with short black hair, the shorter with dreadlocks, each weighing about 170 pounds is quite probative where the two individuals arrested fleeing from the car were two black males, one 6'2" tall, the other 5'7", the tall of with short black hair, the shorter with dreadlocks, one weighing 170 pounds and the other 150. This factor strongly supports the reliability of the subsequent identifications.

The fourth *Biggers* factor is the witness's level of certainty in the identification. As the Seventh Circuit has pointed out on numerous occasions, there is reason to question the value of this factor in assessing the reliability of an identification. Simply put, "[p]sychological research has established that the witness's faith is equally strong whether or not the identification is correct." *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003). The Supreme Court, however, has not

disavowed witness confidence as a factor relevant to the assessment of reliability,[3] and the Seventh Circuit has continued to include it in assessing the reliability of identifications. *See, e.g.*, *United States v. Nunez-Guzman*, 554 Fed. App'x 507, 513 (7th Cir. 2014); *McFowler v. Jaimet*, 349 F.3d 436, 449 (7th Cir. 2003). Accordingly, this Court is not free to ignore witness confidence as a factor supporting reliability. The defendants, moreover, offer neither evidence nor argument challenging the correlation of confidence and accuracy, so they have forfeited the point in any event. *Phillips*, 668 F.3d at 916 (noting defendant's failure to proffer evidence undermining the claim of unreliability). Nevertheless, it merits but little weight here because the record reflects only that both victims indicated, before seeing the offenders, that they believed that they would be able to identify the offenders; no information has been provided as to the confidence of the witnesses in the identifications once they made them.

That said, there is substantial probative value in the fact that Victim A was **not** able to identify Dortch. The issue here is whether there is reason to believe that the identifications were the product of the suggestiveness of the show up procedures rather than the witnesses' independent observations of the offenders. That Victim A could not identify Dortch is convincing evidence that Victim A was not swayed by the suggestive nature of the show up and, therefore, that his identification of Jones was based on his independent observation and recognition that Jones was the assailant who hit him in the head with a gun. Further, that the suggestiveness of the show up did not influence Victim A also adds weight to the inference that Victim B wasn't swayed by the

---

[3] As the Seventh Circuit explained in *Phillips v. Allen*, 668 F.3d 912, 916-17 (7th Cir. 2012), the American Psychological Association filed an amicus brief in *Perry v. New Hampshire*, 565 U.S. 228 (2012), advising the Supreme Court that "the outcomes of empirical studies, reviews, and meta-analyses have converged on the conclusion that the confidence-accuracy relationship for eyewitness identification is weak . . . ." Nevertheless, "[t]he Court bypassed this topic in *Perry*, leaving to the future any inquiry into the *Biggers* framework." *Id*. at 917.

10

suggestiveness of the show up process either. It is also significant that it was Victim A who could not identify Dortch; Victim A testified that the unknown offender first approached him from behind, so he did not get as good a look at that offender as he did of Offender 2. Victim B on the other hand, watched both offenders deal with Victim A before they tried to rob B. That Victim B can identify both offenders while A can only identify Jones is consistent with the victims' accounts of the crime and provides further confidence in the reliability of their identifications.

Finally, the time between the victims' initial observations of the offenders and their identifications was brief, barely an hour. That temporal proximity obviously enhances the reliability of the identifications.

These factors, in combination, provide sufficient indicia that the identifications by the victims are reliable products of their independent recollections rather than the product of the unduly suggestive nature of the show up. (And certainly they do not provide a basis to conclude that there was a substantial likelihood of ***misidentification***). But there is more. Although the strength of evidence corroborating an identification is not expressly included in the factors identified in the *Biggers* reliability factors, the Supreme Court did not say that the factors were exclusive; to the contrary, in *Biggers* the Court confirmed that reliability should be evaluated by the totality of the circumstances. 409 U.S. at 110; *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (*Biggers* employed a "totality of the circumstances" approach to the assessment of the reliability of out-of-court identifications). As the Seventh Circuit has acknowledged on several occasions, an evaluation of the reliability of an identification may also take account of independent corroborating evidence. In *Kosick v. Napoli*, 814 F.2d 1151, 1161 (7th Cir. 1987), for example, the Court of Appeals took into account the "significant corroborative testimony" from other witnesses as to the description of a car and its occupants in assessing the reliability of out-of-court

identifications, noting that the corroborative testimony could not have been tainted by the suggestive procedures.")[4]

It is significant, as to the identification of defendant Jones, that there were two identifications that clearly did not influence each other (as evidenced by fact that Victim A did not identify Dortch while Victim B did). Simply put, when there are multiple identifications of the same individual, the risk of misidentification is diminished. *See United States v. West*, 528 F. App'x 602, 605–06 (7th Cir. 2013) ("We also find strong support for the district court's finding here in the facts (a) that witnesses Graham and Pues identified West as the robber, (b) that their descriptions just after the robberies were consistent with Amore's, (c) that their testimony is not challenged, and (d) that all three gave their descriptions and made their identifications independently of one another"); *United States v. Williams*, 522 F.3d 809, 812 (7th Cir.2008) (independent and consistent identifications by multiple witnesses enhances reliability and reduces risk of error in identifications).

---

[4] The Supreme Court has not addressed this question. In *Mason v. Brathwaite*, the Court noted that the available corroborating evidence—which included evidence that a defendant who had been identified as the individual who sold heroin to an undercover officer was a frequent visitor to the apartment where the sale had taken place and was present there when he was arrested—"hardly undermined" the Court's assessment that the undercover officer's out-of-court identification prior to the arrest was reliable but did not otherwise factor the corroborating evidence into its reliability analysis. 432 U.S. at 116. The Seventh Circuit, however, is not alone in considering corroborating evidence into account in assessing the reliability of identifications. *See, e.g.*, *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) ("Courts may also consider other evidence of the defendant's guilt when assessing the reliability of the in-court identification); *United States v. Lau*, 828 F.2d 871, 875 (1st Cir.1987) (Breyer, J.) (supplementing consideration of *Biggers* factors with corroborating evidence that one defendant had license to fly the plane in question, another was nearby the site where the transaction occurred, and the witness used the defendants' correct names when first describing them to the authorities, to support the reliability of the witness' identification of the defendants), *cert. denied*, 486 U.S. 1005 (1988); *United States v. Bell*, 812 F.2d 188, 193 (5th Cir.1987) (identification may be reliable in the context of all the circumstances and evidence).

There is, moreover, even stronger corroborative evidence. The reliability of the victims' identifications is difficult to question given that the defendants were driving the victims' car in the vicinity of the carjacking less than half an hour after the crime was committed, fled when signaled to pull over, and then ran from the Jeep after crashing it while being pursued by police. Police then found a gun that matched the description of the gun that the witnesses had provided and that both victims subsequently identified as the gun that Offender 2 had brandished. This evidence makes it quite unlikely that the victims misidentified the defendants as the carjacking assailants. The defendants offer neither an explanation for how they came to be fleeing from police in the victim's car nor a denial that they were in the car, so they provide no basis at all, much less a substantial one, to conclude that the victims misidentified the defendants as the carjackers. (And, again, having proffered no evidence to contradict the government's account of their apprehension, the defendants have not identified a factual dispute that requires an evidentiary hearing to sort out; the government's account, at this juncture, is unrebutted and, in this context, where the defendant has the burden of proof, that will not do.)

For these reasons, the Court finds that the out-of-court identifications by the victims do not offend due process. They are sufficiently reliable and may therefore be admitted at trial, where it will be for a jury to determine what weight, if any, to give to the identifications. Accordingly, the defendants' motion to suppress the out-of-court identifications by the victims is denied.

Dated: October 23, 2018

_____
John J. Tharp, Jr.
United States District Judge